IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Mark L. Carman

Civil Action No. 14-cv-02704-PAB-MLC

NATHAN YBANEZ,
SIMON SUE,
SAM LINCOLN,
ATORRUS RAINER,
GREG RIVAS,
PATRICK SUCHAIYA,

        Plaintiffs,

v.

RICK RAEMISCH, in his official capacity as Executive Director of the Colorado Department of Corrections (CDOC),
LOU ARCHULETA, in his official capacity as Director of Prisons for CDOC,
BERNADETTE SCOTT, in her official capacity as Lieutenant of the SCF Mail Room and in her individual capacity,
SCF MAIL ROOM EMPLOYEE "DJ", in his/her individual capacity,
MICHELLE NYCZ-HALLIGAN, in her official capacity as a Major on the SCF Publication Review Committee and in her individual capacity,
SCF MAIL ROOM EMPLOYEE "PDR", in his/her individual capacity,
IRIS CHRISTIANS, in her individual capacity,
SCF MAIL ROOM EMPLOYEE "Z SMITH", in his/her individual capacity,
SCF CORRECTION OFFICER OCHOA, in her individual capacity,
SCF SERGEANT ROBERT HRADECKY, in his individual capacity,
ANDRIES PRINSLOO, in his individual capacity, and
JOHN CHAPELAINE, in his individual capacity,

        Defendants.

---

## REPORT AND RECOMMENDATION

---

Magistrate Judge Mark L. Carman

        This matter comes before the court on the "Defendants' Motion for Summary Judgment"

(Doc. 148), filed on September 18, 2017, by Defendants Rick Raemisch, Lou Archuleta,

Bernadette Scott, Deon Jimenez, Michelle Nycz-Halligan, Robert Ryles, Iris Christians, Edward Smith, Claudia Ochoa, Robert Hradecky, and John Chapdelaine.

This court has carefully considered the Motion, the related briefing, the entire case file, and applicable case law. For the following reasons, the court recommends that the Defendants' Motion be granted in part and denied in part.

## BACKGROUND

Plaintiffs Nathan Ybanez, Simon Sue, Sam Lincoln, Atorrus Rainer, Greg Rivas, and Patrick Suchaiya, filed this lawsuit pursuant to 42 U.S.C. § 1983 against various employees of the Colorado Department of Corrections ("CDOC"). In their Third Amended Prisoner Complaint ("Complaint") (Doc. 55), Plaintiffs allege numerous violations under the First and Fourteenth Amendments arising from Defendants alleged censorship and seizure of magazines and personal mail deemed to be "sexually explicit."

According to the Complaint, the CDOC was previously subject to a settlement agreement that prohibited it from censoring sexually explicit materials unless it fit within the following categories:

> Materials that clearly depict or describe bestiality, pedophilia, sadism, masochism, necrophilia, discharge of bodily fluid, oral, anal or vaginal penetration by animate or inanimate objects, or oral sex.

(the "original policy"). Doc. 148-1 at 2[1]. The original policy, codified as AR 300-26, also specifically provided that materials could not be rejected solely because "its content is religious, philosophical, political, social, or *sexual*, or because of its religious, philosophical, political, or social views, *its sexual content*, or because it is unpopular, repugnant, or critical of the [CDOC] or other government authority." *Id.* at 3 (emphasis added).

---

[1] As a convention, the court cites to the electronic filing page numbers, as opposed to any page numbers assigned by Plaintiffs or Defendants.

However, following the expiration of the settlement agreement, the CDOC amended AR 300-26 ("June 2012 policy"). Among the many changes to the policy, the definition of "sexually explicit" material was amended to include nudity. Doc. 148-2 at 2. In addition, "sexual content" was specifically removed from the list of content-based categories. *Id.* at 4. The policy was amended again in November 2012 ("November 2012 policy"). This version retained the new definition of "sexually explicit," but it also provided for certain categories of exceptions that could be permitted: "A publication may be allowed which would otherwise fall within the definition of sexually explicit if [] the publication has literary, educational, scientific, artistic or historic value."[2] Doc. 148-3 at 5.

In their Complaint, Plaintiffs contend that the June and November 2012 policies are facially unconstitutional because they violate their First Amendment and Due Process rights. Doc. 55. In addition, they allege that Defendants withheld numerous publications and items of personal mail that did not meet the definition of "sexually explicit." Plaintiffs also claim that many of these items were withheld or seized from them without any notice or any opportunity to appeal the decisions. *Id.*

Following the court's ruling (Doc. 101) on the Defendants' Motion to Dismiss (Doc. 80), Plaintiffs and Defendants engaged in a period of discovery. Thereafter, Defendants filed their Motion for Summary Judgment. Doc. 148. They contend that based on the undisputed material facts, judgment should be entered in their favor. *Id.* They also argue that they are entitled to qualified immunity. *Id.* In support of their Motion, Defendants have submitted a number of declarations together with supporting evidence and exhibits. Plaintiffs filed their Response (Doc. 157) on November 20, 2017, which was followed by Defendants' Reply (Doc. 167) on

---

[2] This exception was included in the June 2012 policy, but, apparently, only the Director of Prisons was permitted to make such exceptions. Doc. 148-2 at 6.

December 18, 2016. Plaintiffs were then permitted to file a Surreply (Doc. 173) on February 12, 2018, to respond to an argument raised for the first time in Defendants' Response brief.

## STANDARD OF REVIEW

Summary judgment is appropriate only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.,* 41 F.3d 567, 569 (10th Cir. 1994). To meet the burden of persuasion required to support summary judgment, the movant must "point to those portions of the record that demonstrate an absence of a genuine issue of material fact, given the relevant substantive law." *Thomas v. Wichita Coca-Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir. 1992) (citing *Celotex Corp.,* 477 U.S. at 322-23 (1986)). A fact is "material" if under the substantive law it could have an effect on the outcome of the lawsuit. *Equal Emp't Opportunity Comm'n v. Horizon/CMS Healthcare Corp.,* 220 F.3d 1184, 1190 (10th Cir. 2000) (citing *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986)). A factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *Anderson,* 477 U.S. at 248.

While the moving party bears the initial burden of showing that there is an absence of any issues of material fact, *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir. 1991), the movant need not negate the non-movant's claim. *See John Hancock Mut. Life Ins. Co. v. Weisman,* 27 F.3d 500, 503 (10th Cir. 1994); *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.,* 22 F.3d 1527, 1529 (10th Cir. 1994). Once the moving party points to an absence of evidence to support the non-moving party's claim, the non-moving party may not rest upon his or her pleadings, but must present specific facts showing that there *is* a genuine issue for trial as to the elements

essential to the non-moving party's case. *See* Fed. R. Civ. P. 56(e). *See also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010). If the non-moving party will bear the burden of proof at trial, it must come "forward with sufficient competent evidence to establish a *prima facie* claim." *Green Earth Wellness Ctr., LLC v. Atain Specialty Ins. Co.*, 163 F. Supp. 3d 821, 825 (D. Colo. 2016).

The court must construe the factual record and reasonable inferences therefrom in the light most favorable to the non-moving party. *Kidd v. Taos Ski Valley, Inc.*, 88 F.3d 848, 851 (10th Cir. 1996). "[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (quoting *Anderson*, 477 U.S. at 249). Ultimately, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

Conclusory allegations will not create a genuine issue of material fact necessitating trial. *Dobson v. City & Cty. of Denver*, 81 F. Supp. 2d 1080, 1083 (D. Colo. 1999). *Cf. Nichols v. Hurley*, 921 F.2d 1101, 1113 (10th Cir. 1990) (acknowledging "conclusory allegations without specific supporting facts have no probative value"). Evidence that is not significantly probative and immaterial factual disputes will not defeat a motion for summary judgment. *Ayon v. Gourley*, 47 F. Supp. 2d 1246, 1252 (D. Colo. 1998). The demonstration of "some metaphysical doubt as to the material facts" is not sufficient to establish a genuine issue of material fact. *Foreman v. Richmond Police Dep't*, 104 F.3d 950, 957 (7th Cir. 1997). "The very purpose of a summary judgment action is to determine whether trial is necessary." *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). In short, this court must determine whether the non-moving

party has come forward with specific facts to overcome the moving party's motion in whole or in part.

## ANALYSIS

### I.     Mootness

In their Reply, Defendants allege that in February 2016, the November 2012 policy was "significantly changed" and the definition of nudity was amended in an effort to remedy some of the strict interpretations that occurred under the previous language. Doc. 167 at 40. Defendants allege that the CDOC has "taken specific actions to right the unintended over-censorship that occurred under the prior definitions of nudity." *Id.* at 41. They argue, therefore, that Plaintiffs' facial challenge is moot. The court is not persuaded.

It is well established that a defendant's "voluntary cessation of a challenged practice" moots an action only if "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 189 (2000); *see Knox v. Serv. Emps. Int'l Union, Local 1000,* 567 U.S. 298, 307 (2012) ("The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed."); *United States v. W.T. Grant Co.,* 345 U.S. 629, 632 (1953) ("voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot"). "The 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Friends of the Earth,* 528 U.S. at 189 (quoting *United States v. Concentrated Phosphate Exp. Ass'n,* 393 U.S. 199, 203 (1968)).

Here, the Defendants have not conceded that the challenged versions of the policy violated the First Amendment. *See* Doc. 167 at 41-42. Nor has any Defendant submitted any affidavit or otherwise stating that the prior policies were constitutionally suspect and, therefore, will never be re-implemented by the CDOC. Rather, the evidence submitted with Defendants' Reply indicates that the changes were made for clarification purposes. Doc. 167-1 at 10-11. Defendants have not pointed to any legal or practical barrier to their reinstatement of the previous versions of the policy, and "they have failed to even offer a bald conclusory pledge not to return to such policies." *Prison Legal News v. Stolle*, No. 2:13cv424, 2015 WL 1487190, at *4 (E.D. Va. July 8, 2016); *see also Young v. Raemisch*, No 13-cv-01744-RPM, 2015 WL 4607679, at *1 (D. Colo. Aug. 3, 2015) (rejecting Defendants argument regarding mootness where there was "nothing to assure [the court] that the officials responsible for the mail policy recognize the need to consider the First Amendment").

Consequently, the court concludes that Defendants have not met their burden in this regard and will proceed to consider the merits of Plaintiffs' facial claims.

## II.     Facial Claims

The Defendants contend that they are entitled to judgment on Plaintiffs' First Amendment claim because the June and November 2012 policies are facially constitutional under the test articulated in *Turner v. Safley*, 482 U.S. 78, 89 (1987). Doc. 148 at 21-27. In addition, Defendants contend that the regulation's censorship procedures adequately protect prisoners' interests under the Due Process clause. The court agrees with Defendants in part.

### A.     Defendants' Credibility

In their Response, Plaintiffs acknowledge that this court may not weigh the credibility of witnesses when determining a motion for summary judgment. *Fogarty v. Gallegos*, 523 F.3d

1147, 1165 (10th Cir. 2008). Nevertheless, they contend that the affidavits and materials submitted with Defendants' motion contain infirmities and, therefore, raise questions as to the legitimacy of their arguments. Doc. 157 at 24-28. Specifically, Plaintiffs lament Defendants citation of more recent versions of AR 300-26, and argue that Defendants are attempting to co-opt provisions from these amended versions.[3] In addition, Plaintiffs also contend that Defendants are improperly attempting to rely on discovery materials disclosed after the discovery deadline had passed.

### 1. Affidavits

First, the court concludes that *Aiello v. Litscher*, 104 F.Supp. 2d 1068 (W.D. Wisc. 2000), cited by Plaintiffs, is distinguishable. In *Aiello*, the district court observed that a prison guard's affidavit was directly contradicted by her deposition testimony and was possibly perjurious. *Id.* at 1071. The court noted that several of the defendants' proposed affiants contradicted their own sworn affidavits or revealed that their "personal knowledge" was actually based on many layers of hearsay. Based on this sanctionable conduct, the court concluded that many of the defendants' proposed facts could not be credited. *Id.* at 1027.

Here, however, Plaintiffs have not cited any such inconsistencies in the submitted affidavits. Rather, the "inconsistency" arises in Defendants' citation errors and in Defendants' citation to later versions of the regulations in their Summary Judgement briefing. In their proposed facts regarding the censorship procedures, Defendants cited to the most recent versions of AR 300-26. In explanation, Defendants state that they believed Plaintiffs were challenging AR

---

[3] Plaintiffs also seem to challenge various affidavits submitted by Defendants on the basis that they portray "feelings and opinions as 'facts.'" Doc. 157 at 25. Plaintiffs argue that Defendants have not produced any evidence to support their concerns regarding sexually explicit materials. The court addresses this argument in its substantive analysis of whether the policies meet the factors set forth in *Turner*. *See infra* Section II.B.1.

300-26 generally, as opposed to only challenging the June and November 2012 versions.[4] Defendants further contend that the citations to the more recent versions are relevant to demonstrating that the policy has materially changed and, therefore, that Plaintiffs' facial claims are moot.[5] Whatever, the explanation for these citation errors and inconsistencies, the court concludes that it does not implicate the veracity of the affiants.

Unlike in *Aiello*, none of these affiants have contradicted their affidavits with sworn deposition testimony. Indeed, none of Defendants' affiants refer to these more recent versions of AR 300-26 as the basis for their statements. *See* Docs. 148-8, -9, -10. Furthermore, the court is not confronted with a situation wherein it must sift through the evidence to determine which of the implicated facts are truly undisputed. *Aiello*, 104 F.Supp.2d at 1072. Defendants' citation to the more recent version of AR 300-26 — and thereby policy provisions that are not at issue in this case — is easily remedied. The court has been provided with copies of the at-issue policies (Doc. 148-2 (June); Doc. 148-3 (November)) and refers to them as evidence of what policy provisions are implicated in Plaintiffs' claims.

### 2. Late Disclosures

Plaintiffs also argue that, pursuant to F.R.C.P. 37(c)(1), this court should disregard the attachments to Keith Nordell's affidavit (Doc. 148-8) because these documents were disclosed after the discovery period had ended.[6] Defendants contend that the untimely disclosure is harmless.

---

[4] At the time this lawsuit was initiated, the November 2012 version was the most up-to-date version of the policy. The policy was amended in February 2016, three weeks before this court issued its recommendation regarding the pending motions to dismiss.

[5] If this was indeed Defendants' design in citing the most recent versions of the policy, it is curious they chose not to raise their mootness argument until their Reply brief.

[6] Although Plaintiffs present this argument under the rubric of assessing Defendants' credibility, Plaintiffs' contentions and request for relief seem more properly characterized as a motion to exclude evidence pursuant to F.R.C.P. 37(c). Under the Colorado Local Rules, motions are not to be made in

"The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Mid–America Tablewares, Inc. v. Mogi Trading Co.,* 100 F.3d 1353, 1363 (7th Cir. 1996). A district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose. *United States v. $9,041,598.68,* 163 F.3d 238, 252 (5th Cir. 1998). Nevertheless, the following factors should guide its discretion: (1) the prejudice or surprise to the party against whom the [information] is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such [information] would disrupt the trial; and (4) the moving party's bad faith or willfulness.

*Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.,* 170 F.3d 985, 993 (10th Cir. 1999).

The court first observes that Plaintiffs have not made any representation that they were surprised by the late disclosure of these discovery items. Indeed, during the deposition of Adrienne Jacobson, Mr. VanLandschoot (defense counsel) informed Mr. McConomy (plaintiffs' counsel) that he had requested Mr. Nordell's file to ensure that all of the necessary email attachments had been provided. Doc. 167-1 at 6. Thus, Plaintiffs were at least on notice that additional documents could be forthcoming. In addition, Plaintiffs had an abundance of time to cure any prejudice that may have resulted. Following the close of discovery — and after the untimely disclosures had been made — the parties filed a joint request to extend the dispositive motion deadline by six weeks; however, this motion made no mention of the tardy disclosures or any resultant prejudice. Doc. 144. Rather, the parties represented that discovery had been cooperative. In addition, the court held a status conference on August 4, 2017, but Plaintiffs again failed to discuss these late disclosures. *See* Doc. 147. And following the submission of Defendants' Motion, Plaintiffs were granted an additional extension of time to file a response. Doc. 154. Finally, Defendants made these disclosures twenty-four days after the close of

---

response to the original motion, and should be filed separately. D.C.Colo.LCivR 7.1(d). Nevertheless, the court addresses the substance of this argument.

discovery and nearly four months before Plaintiffs' response was due. This weighs against finding that Defendants acted in "bad faith" in disclosing these items after the discovery deadline. Under these circumstances, the court concludes that Defendants' late disclosure was harmless.

B.      First Amendment

It is well settled that inmates have a First Amendment right to receive information while in prison to the extent that right is not inconsistent with prisoner status or the legitimate penological objectives of the prison. *Jacklovich v. Simmons*, 392 F.3d 420, 426 (10th Cir. 2004) (citing *Pell v. Procunier*, 417 U.S. 817 (1974)). The Supreme Court has held that a prison regulation that impinges on an inmate's First Amendment rights is valid only if it is "reasonably related to legitimate penological interests." *Searles v. Dechant*, 393 F.3d 1126, 1131 (10th Cir. 2004) (quoting *Turner*, 482 U.S. at 89). This reasonableness standard requires the court to "balance the guarantees of the Constitution with the legitimate concerns of prison administrators." *Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002).

In *Turner v. Safley*, the Supreme Court articulated four factors that should be considered in determining the constitutionality of a prison's restrictions on speech: (1) whether a valid and rational connection exists between the regulation and the legitimate government interest it protects; (2) whether the inmates have alternative means for exercising the constitutional right; (3) the impact accommodating the right will have on guards, other inmates, and the allocation of prison resources; and (4) whether alternatives readily exist that would accommodate the prisoner's rights. 482 U.S. at 89-91. This analysis requires the court, "on a case-by-case basis, to look closely at the facts of a particular case and the specific regulations and interests of the

prison system in determining whether prisoners' constitutional rights may be curtailed."
*Beerheide*, 286 F.3d at 1186.

### 1. Rational Connection

The analysis of the first *Turner* factor is two-fold. The court must determine whether the governmental objective underlying the regulation is legitimate and neutral, and also whether the regulation is rationally related to the objectives. *Sperry v. Werholtz*, 413 F. App'x 31, 40 (10th Cir. 2011) (affirming summary judgment in favor of defendants where Secretary of the Kansas Department of Corrections' affidavit testimony established that the amended regulation was reasonably related to legitimate penological interests) (citing *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989)).

One of the stated reasons for the CDOC's amendment to the regulations is maintaining the rehabilitative goals for both sex-offenders and non-sex-offenders. *Nordell Affidavit*, Doc. 148-8 at ¶¶ 10, 17; *Woodson Affidavit*, Doc. 148-10 at ¶¶ 6-10. Another stated reason for the amendment is maintaining internal prison security. *Trani Affidavit*, Doc. 148-9 at ¶¶ 5-8; *Nordell Affidavit*, Doc. 148-8 at ¶¶ 11, 22. These are unquestionably legitimate purposes. *See Pell*, 417 U.S. at 823 ("[A]nother paramount objective of the corrections system is the rehabilitation of those committed to its custody."); *Thornburgh*, 490 U.S. at 415 (finding regulations expressly aimed at protecting prison security serve a purpose that is central to all other corrections goals).

The neutrality inquiry focuses on whether the regulations restricting inmates' First Amendment rights operate without regard to the content of the expression. *Turner*, 482 U.S. at 90. "[T]he regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression." *Thornburgh*, 490 U.S. at 415. Here, the June and November 2012 policies are neutral. The CDOC's administrators drew a

distinction between materials based on the material's potential effect on the CDOC's legitimate objectives. *See Nordell Affidavit*, Doc. 148-8 at ¶¶ 5, 8, 11, 16-19, 22. Further, the language of these policies instructs prison employees to censor sexually explicit materials without regard to gender or orientation. And the November 2012 policy specifically instructs that publications are not to be censored solely because of its religious, philosophical, political, or social views. *See Thornburgh*, 490 U.S. at 415-16 ("Where, as here, prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral' in the technical sense in which we meant and used that term in *Turner*.")[7]

Finally, the court concludes that the June and November 2012 policies are rationally related to the CDOC's legitimate objectives. "To show a rational relationship between a regulation and a legitimate penological interest, prison officials need not prove that the banned materials actually caused problems in the past, or that the materials are 'likely' to cause problems in the future." *Sperry*, 413 F. App'x at 40 (quoting *Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999)). It is not necessary to present empirical evidence. *Id*. Furthermore, the court need not agree with the Defendants or agree that the policy "in fact advances" the CDOC's legitimate interests. *Id*. Rather, the court must only determine whether the CDOC might reasonably have believed that the policy would advance the interest. *Id*.

In their Response, Plaintiffs contend that the policies are not rationally related to the CDOC's interest in rehabilitation or prison safety because Defendants have not produced evidence that any general population inmate ever provided sexually explicit materials to a sex-offender. Doc. 157 at 35. In addition, Plaintiffs provide their own declarations stating that they

_____

[7] Plaintiffs do not appear to challenge the legitimacy of these goals or the neutrality of the policies. Rather, the Plaintiffs focus on whether the policies are rationally related to these goals. *See* Doc. 157 at 29-41.

had no knowledge of any instances of this occurring. *See, e.g., Ybanez Declaration*, Doc. 157-2 at ¶¶ 8-13.[8] Plaintiffs also attest that, based on their experience, Defendants' concerns regarding violence and prison safety are unfounded. These arguments are not persuasive.

First, with respect to Plaintiffs' declarations, Plaintiffs are inmates in the custody of the CDOC. Nothing in the record, however, suggests that Plaintiffs would be knowledgeable — or competent to testify — about prison-wide incidents of sex-offenders obtaining sexually explicit materials. Nor does anything suggest that they could testify about security threats throughout the entire CDOC. Thus, Plaintiffs' declarations do not create a disputed issue of material fact as to rationality.

However, Mr. Nordell, the Contracts Manager for the CDOC, has personal knowledge about the information-gathering process leading up to the revisions in June and November 2012. Doc. 148-8 at ¶¶ 5-6. Based on his experience with the Central Reading Committee, Mr. Nordell was aware that under the previous policy, cellmates would share reading materials even if one cellmate was under a reading restriction. *Id.* at ¶ 10. He also attests that sexually explicit materials became a form of currency for bartering, which presented a safety issue. *Id.* at ¶ 11. Similarly, Mr. Trani, the Director of Prisons, attested that — based on his extended employment with the CDOC wherein he has served in numerous capacities — bartering of sexually explicit materials was commonplace. Doc. 148-9 at ¶¶ 2-3, 5. He further states that this bartering could lead to extortion as well as violence. *Id.* at ¶¶ 6-8.

Defendants also submit the affidavit of Mr. Woodson, a licensed therapist and the Program Administrator for the Sex Offender Treatment and Monitoring Program. Doc. 148-10 at ¶¶ 3-4. Mr. Woodson is personally aware of the rehabilitative goals of the CDOC and attests that

_____

[8] The affidavits of Plaintiffs Sue, Lincoln, Rainer, and Rivas make similar statements. *See* Docs. 157-3, -4, -5, -6.

restricting sexually explicit materials is particularly important for the rehabilitation of sex offenders, because these materials can reinforce patterns in thought or behavior which led the person to offend. *Id.* at ¶ 8. He further attests that, from a general rehabilitation perspective, the presence of sexually explicit materials may also undermine the rehabilitation goals for general population inmates. *Id.* at ¶ 9.[9]

In response, Plaintiffs cite a study which suggests a correlation between allowing nudity in prisons and lower rates of prison violence. Doc. 157 at 39. In addition, they argue that Defendants have failed to determine the efficacy of these challenged policy revisions. *Id.* Plaintiffs' reliance on this study is misplaced.[10] The CDOC is not required to prove that these banned materials actually caused problems in the past. Nor are they required to prove that these materials would be likely to cause a problem in the future. And it is not the province of this court to determine whether, in fact, the policy advances the legitimate interests. *Sperry*, 413 F. App'x at 40. Rather, this court's inquiry is whether the "logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89-90.

Here, the relationship between the possession of sexually explicit materials and the problems sought to be addressed by the policy — rehabilitation of offenders and security concerns — is clear. In the past, inmates were able to barter for sexually explicit materials, which could lead directly to violence and extortion. Further, inmates convicted of sex offenses were regularly able to obtain sexually explicit materials despite reading restrictions. The June and November 2012 policies reduced the amount of sexually explicit material within the CDOC,

---

[9] Plaintiffs have not challenged any of these affidavits pursuant to F.R.C.P. 56(c)(4).

[10] The court also observes that Plaintiffs have not indicated how this study would be admitted into evidence. It is not accompanied by any affidavit or testimony from an expert who would be qualified to testify as to its contents. *See* F.R.C.P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

thus mitigating the ability of inmates to barter for these items and reducing the chance of these items being available to sex offender. *See, e.g., Jones v. Salt Lake Cty.,* 503 F.3d 1147, 1155–56 (10th Cir. 2007) ("The jail's ban on inmate access to 'sexually explicit material' and 'technical publications' is expressly aimed at advancing jail security and the ban on 'sexually explicit material' also protects the safety of jail personnel and other inmates."); *Mauro,* 188 F.3d at 1054 (noting the relationship between the jail's policy of prohibiting sexually explicit materials and the goals of preventing sexual harassment, inmate rehabilitation, and jail security is not so "remote as to render the policy arbitrary or irrational."). Further, even if this court were to accept that Plaintiffs' cited study demonstrates that the connection between the policies and the legitimate interest is not an exact fit, an exact fit is not required. All that is required is a rational connection, which is met in this case.

Plaintiffs also contend that the policy provision permitting censorship — as sexually explicit — of any material that "[c]ontains any display, actual or simulated, or description of [the] discharge of bodily fluid" could lead to the censorship of photographs of sweaty athletes, medical images, or President Obama's tears. *Id.* Citing to *Couch v. Jabe,* 737 F.Supp. 2d 561 (W.D. Va. 2010), Plaintiffs argue that the June and November 2012 policies are overbroad because they could lead to these bizarre interpretations and are, therefore, irrational.[11] Doc. 157 at 41-42. The court is not persuaded.

In *Couch,* the at-issue regulation, which censored "explicit or graphic depictions of sexual acts," was applied to exclude the books *Ulysses* and *Lady Chatterley's Lover* from the prison library, and the plaintiff was prevented from ordering those books from a private vendor. 737 F.Supp. 2d at 563. The District Court for the Western District of Virginia observed that the

---

[11] Plaintiffs seem to make this argument in connection with the second *Turner* factor. However, because this argument ultimately contends that the regulation is irrational, the court addresses it under the rubric of the first *Turner* factor.

regulation could be applied to exclude numerous works of literature but would not extend to publications such as *Playboy* magazine. Because the regulation was subject to such "bizarre interpretations," the court concluded that it was not rationally related to the legitimate penological interests. *Id.* at 568-72. This case, however, is distinguishable.

Here, unlike in *Couch*, Plaintiffs admit that nothing as egregious as their proposed hypothetical has occurred.[12] Nor has there been any argument that censorship akin to what occurred in *Couch* has occurred in this case. Furthermore, the regulation in *Couch* did not include an exception for items with literary or artistic value. *See Gardner v. Mould*, No. 7:13CV00429, 2014 WL 3513150, at * 1 (W.D. Va. July 14, 2014) (distinguishing *Couch* on the basis that it evaluated a prior version of the regulation, and noting that the Virginia DOC subsequently amended the policy to correct the problem; the new regulation included an exception for works with artistic or literary value). Here, the June and November 2012 policies included exceptions for sexually explicit publications if the publication had literary, educational, scientific, artistic, or historic value. *See* Doc 148-2 at 6; Doc, 148-3 at 5. Therefore, the court is not persuaded that the policies in this case would lead to "bizarre" applications like those confronted in *Couch*.[13]

---

[12] The court observes that similar regulations regarding discharge of bodily fluids do specify that it must be in the context of sexual activity, whereas the at-issue regulations do not. *See Jones v. Sinclair*, No. C14-1241-RAJ-MAT, 2014 WL 8849985, at *1 (W.D. Wa. Nov. 18, 2014); *Couch*, 737 F.Supp. 2d at 563. However, in light of the contextual placement of this particular definition — specifically listed with other sex acts — it seems unlikely that prison officials would interpret this phrase the way Plaintiffs suggest.

[13] The court is similarly unpersuaded by Plaintiffs' citation to *Prison Legal News v. Stolle*, No. 2:13cv424, 2015 WL 1487190 (E.D. Va. Mar. 13, 2015), for the principle that barring publications based on "thumbnail images" is evidence that a regulation sweeps too broadly. Although the court, in *Stolle*, did state in a footnote that barring issued of *Prison Legal News* based on thumbnail images supported its conclusion that the ban was an exaggerated response, this was not the primary reason for its conclusion. Rather, the court observed that the regulatory language prohibiting images that were "offensive" allowed for viewpoint-based censorship. The court also observed that the regulation term "scantily clad" was undefined and resulted in the censorship of women in tight skirts or bathing suits. As such, the court concluded that the regulation was too broad. The regulations at issue here do not contain similarly

Finally, Plaintiffs seem to argue that the policy is overbroad because the exception for publications with literary, educational, scientific, artistic, or historic value is merely nominal. Doc. 157 at 42-45. Citing a number of their as-applied challenges, Plaintiffs contend that Defendants have failed to provide any evidence that these exceptions were ever considered. For two reasons, the court considers this argument to be misplaced. First, "[t]he burden . . . is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Sperry*, 413 F. App'x at 40 (citing *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)). Second, "[t]he question for [the court] is not whether the regulation in fact advances the government interest, only whether the [defendants] might reasonably have thought that it would." *Amatel v. Reno*, 156 F.3d 192, 199 (D.C. Cir. 1998). As discussed above, the court concludes that the Defendants could reasonably have believed that the regulation would have advanced it interests. Thus, the court resolves the first *Turner* factor in favor of Defendants.[14]

### 2. Alternative Avenues

The second *Turner* factor requires this court to consider "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. "Where 'other avenues' remain available for the exercise of the asserted right, courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.'" *Id.* (citations omitted). "[T]he right in question must be viewed sensibly and expansively." *Thornburgh*, 490 U.S. at 417. This factor is satisfied when the regulation "permit[s] a broad range of publications to be sent, received, and read." *Id.* at 418. Here, the June and November 2012 policies did not categorically prohibit any specific

---

undefined terms. Further, Defendants attest that thumbnail photos are problematic because they can be enlarged on a copy machine. Doc. 148-10 at ¶ 7.

[14] Indeed, it is worth noting that the Tenth Circuit upheld a Kansas Department of Corrections regulation that is substantially similar to the one at issue in this matter. *Sperry*, 413 F. App'x at 39-42.

publication. Doc. 148-8 at ¶ 23. Rather, the decisions were made based on whether the publications contained sexually explicit materials. *Id.* Under these policies, inmates still retained the right to receive a wide range of publications. Doc. 148-9 at ¶ 11. Thus, the second factor is satisfied.

### 3. Impact on Others

The third *Turner* factor requires the court to consider the likely impact that accommodation of Plaintiffs' asserted First Amendment right will have on other inmates and guards in the prison. *Turner*, 482 U.S. at 90. In this case, the court must determine the impact of allowing an inmate unrestricted access to sexually explicit materials. *Mauro*, 188 F.3d at 1061 (citing *Turner*, 482 U.S. at 92).

"The impact of such unrestricted access would be significant." *Id.* As previously discussed, unrestricted access to sexually explicit materials would thwart rehabilitation goals for sex offenders and members of the general prison population. Doc. 148-8 at ¶¶ 10, 17; Doc. 148-10 at ¶¶ 6-10. In addition, increased access would lead to the bartering of such materials, which, in turn, creates security concerns due to the possibility of extortion, creation of debts, or expectations of *quid pro quo* arrangements. *See* Doc. 148-9 at ¶¶ 5-8; Doc. 148-8 at ¶¶ 11, 22.

Plaintiffs contend that allowing a broader scope of admissible material would streamline the review process by reducing the amount of materials for which CDOC staff must scan. Doc. 157. Even if the court were to credit this contention *arguendo*, this efficiency would be at the expense of the rehabilitation goals and security concerns, as noted above. "Where, as here, the right in question 'can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike,' [we] should defer to the 'informed discretion of

corrections officials.'" *Thornburgh*, 490 U.S. at 418 (quoting *Turner*, 482 U.S. at 90-92). Consequently, the court resolves this factor in favor of Defendants.

### 4. Exaggerated Response

The final *Turner* factor requires the court to consider whether the policies are an exaggerated response to the CDOC's concerns.

> [T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns. *This is not a "least restrictive alternative" test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint.* But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

*Turner*, 482 U.S. at 90-91(emphasis added) (citations omitted). The burden is on Plaintiffs, not on the prison officials, to show that there are obvious and easy alternatives to the policies. *Mauro*, 188 F.3d at 1062; *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350 (1987) ("By placing the burden on prison officials to disprove the availability of alternatives, the approach articulated by the Court of Appeals fails to reflect the respect and deference that the United States Constitution allows for the judgment of prison administrators.").

Plaintiffs suggest that the CDOC could return to the previous version of "sexually explicit material" from the original policy. Doc. 157 at 47-48. Plaintiffs argue that the CDOC already has rules in place regarding bartering and violent conduct, and that the CDOC continues to monitor sex offenders reading materials. They also restate their belief that the CDOC's concerns about bartering and violence are unfounded. *Id.* at 49. They contend, therefore, that the

new definition of "sexually explicit" was an exaggerated response. These arguments are problematic for two reasons.

First, as discussed above, Plaintiffs' individual beliefs regarding the prevalence of bartering and prison violence fails to create a disputed issue of material fact. Plaintiffs are inmates and have presented no evidence as to why they would be qualified to comment on the prison system as a whole. Defendants' affidavits establish that under the previous definition of "sexually explicit" — and in spite of preexisting regulations regarding bartering and violence — these materials were a valuable form of currency bartered between inmates. Defendants also attest that contrary to Plaintiffs' subjective beliefs, the previous regulation was ineffective in reducing the incidence of sex offenders obtaining prohibited materials.

Second, even if the CDOC still continues to regulate and restrict the reading materials for sex offenders, this does not address the CDOC's legitimate interests in the rehabilitation of the general population. In his affidavit, Mr. Woodson attests that from a general rehabilitation perspective, the presence of sexually explicit materials may also undermine the rehabilitation goals for general population inmates. Doc. 148-10 at ¶ 9.

Because Plaintiffs have not pointed to an alternative that accommodates their rights at *de minimis* cost to security and rehabilitative interests, the court finds that the policy is not an exaggerated response to the problems sought to be addressed by Defendants.

Based on the foregoing analysis, the court concludes that the June and November 2012 policies are facially constitutional under the First Amendment and recommends that judgment be entered in favor of Defendants on this claim.

C.    Due Process

The June and November 2012 policies provide that when a facility mailroom receives a publication or correspondence that appears to violate the policy, the offender shall be notified that the mail is being forwarded to the publication review committee for review. Doc. 148-2 at 3 (§ IV.B.1.c); Doc. 148-3 at 3 (§ IV.B.1.c.1). The policies instruct the originating mailroom to send notice to all of the DOC and private prison mailrooms[15] ("subsequent facilities") regarding the publication. Doc. 148-2 at 3 (§ IV.B.1.b.1); Doc. 148-3 at 3 (§ IV.B.1.c.3). These subsequent facilities are then instructed to hold the publication until the originating facility makes a final decision. Doc. 148-2 at 3 (§ IV.B.1.b.4); Doc. 148-3 at 4 (§ IV.B.1.c.6). Both regulations further state that the offenders may appeal a decision to censor a publication prior to the final decision. Doc. 148-2 at 5 (§ IV.C.1.a (permitting appeal to the administrative head or designee)); Doc. 148-3 at 4 (§ IV.B.1.e.1 (allowing offenders to provide input to the facility publication committee)). If the originating facility determines that the publication should be censored, it communicates this decision to the subsequent facilities, which then notify the offenders at that facility. Doc. 148-2 at 5 (§ IV.B.4.d.5); Doc. 148-3 at 6 (§ IV.B.3.c-d). Appeals to the Director of Prisons are discretionary. Doc. 14-2 at 5 (§ IV.B.4.f); Doc. 148-3 at 6 (§ IV.B.3.d.2).

Plaintiffs challenge the June and November 2012 policies on the grounds that they provide inadequate procedural safeguards. The court recognizes that there are potential constitutional problems with these regulations, and further concludes that questions of fact weigh against an entry of summary judgment.

The Supreme Court has held that "[t]he interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a 'liberty' interest within the meaning of the Fourteenth Amendment even though qualified of

---

[15] The November 2012 policy also includes notification for all of the prison libraries.

necessity by the circumstance of imprisonment." *Procunier v. Martinez*, 416 U.S. 396, 417–18 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989). "This liberty interest attaches not only to communications by letter, but also to a prisoner's receipt of subscription publications." *Krug v. Lutz*, 329 F.3d 692, 697 (9th Cir. 2003); *see also Thornburgh*, 490 U.S. at 406 (recognizing "that publishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners"); *Jacklovich*, 392 F.3d at 433 (recognizing "the constitutional rights retained by inmates and those who send them publications"); *Prison Legal News v. Cook*, 238 F.3d 1145, 1152–53 (9th Cir. 2001); *Montcalm Publ'g Co. v. Beck*, 80 F.3d 105, 109 (4th Cir. 1996). Consequently, Plaintiffs have a liberty interest in the receipt of their subscription mailings sufficient to trigger procedural due process guarantees. *See Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972) (such guarantees apply only when a constitutionally protected liberty or property interest is at stake).

In light of the liberty interest involved, the Supreme Court has held that the decision to censor or withhold incoming mail must be accompanied by minimum procedural safeguards. *Martinez*, 416 U.S. at 418-19. The Court affirmed a district court requirement "that an inmate be notified of the rejection of a letter written by or addressed to him, that the author of the letter be given a reasonable opportunity to protest that decision, and that complaints be referred to a prison official other than the person who originally disapproved the correspondence." *Id.*

Reading the June and November 2012 policies on their face, Plaintiffs appear to be correct that notice and an opportunity to be heard are only afforded to the fist offender to receive the questionable publication. Although the subsequent facilities are notified that the publication should be held, there is no indication that these facilities are required to notify any of their

respective inmates. Indeed, it would seem possible that the inmates at the subsequent facilities may not receive any notice until after the final decision has been made. In their Reply, Defendants state that "when a publication is held for review, the policy instructs mailrooms to send notice to all intended recipients." Doc. 17 at 35. It is not clear, however, whether Defendants are arguing that all inmates — at all facilities — are notified, or whether only the intended recipients at the originating facility are notified. Further complicating the matter, Defendants cite a piece of evidence in support of this argument that has not actually been attached to its Reply.[16] In addition, it would also appear that the inmates at the subsequent facilities are not afforded any opportunity to appeal the censorship to any facility publication committee.

"[T]he proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is 'reasonably related to legitimate penological interests.'" *Washington v. Harper*, 494 U.S. 210, 223 (1990) (citing *Turner*, 482 U.S. at 89)). Here, the procedures in the June and November 2012 polices may exclude certain prisoners from procedural protections based on where they reside and whether they receive their subscriptions before prisoners at other locations. Although Defendants state that the *Turner* factors are satisfied with regard to these procedures, they have offered no analysis or substantive argument in that regard. Rather, Defendants' ostensible analysis is simply a description of those procedures. *See* Doc. 148 at 27-29. Further, Defendants' contention, in their Reply, that it would be unreasonable to require input from all of the inmate subscribers is conclusory. *See* 167 at 35-36. Defendants have cited no evidence regarding the

---

[16] Defendants cite Exhibit M, which is the deposition of Adrienne Jacobson, at pages 153 through 156. However, this exhibit does not include these pages. *See* Doc. 167-1. Nor are these pages included with Plaintiffs' submission of the Jacobson deposition. *See* Doc. 157-8.

number of inmates potentially implicated, nor have they cited any evidence concerning costs to the state.

Based on the foregoing, the court concludes that summary judgment in favor of Defendants is not appropriate on this claim and recommends that Defendants' motion be denied on this issue.

## III.    As-Applied Claims

### A.    First Amendment

As a preliminary matter, Plaintiffs concede that the censored *Playboy* and *Penthouse* magazines were consistent with the June and November 2012 policies. Doc. 157 at 52. Similarly, Plaintiffs also admit that the book "Nudes" and the book "Suicide Girls" consist primarily of photos of nude women. *Id.* at ¶¶ 126, 127. And the evidence is undisputed that the censored personal photos intended for Plaintiff Lincoln and Plaintiff Ybanez contained sexually explicit materials. *See* Doc. 148 at ¶¶ 78, 101, 103, 107, 120.[17] As this court has already concluded that the policies' definition of "sexually explicit" is constitutional, censorship of these publications, books, and photos is reasonably related to a legitimate government interest. The individual defendants are entitled summary judgment on any claims regarding the censorship of these materials.

---

[17] Plaintiffs admit all of the allegations except for paragraph 78. Doc. 157 at ¶ 78, 101, 103, 107, 120. However, in response to this paragraph, Plaintiffs simply state they cannot confirm whether the photos contained sexually explicit materials. *Id.* at ¶ 78. They do not present any evidence that would create a disputed issue of material fact. Defendants, on the other hand, have produced evidence that these photos contained nudity. Therefore, the court considers this fact to be undisputed. *See* F.R.C.P. 56(c)(1)(A) (A party asserting that a fact is genuinely disputed must cite to particular parts of the material record).

The remaining publications — *Juxtapoz, Lowrider, Maxim, Skin & Ink, Air Brush Action, Decibel,* and *Yoga Journal*[18] — present a more difficult question. Plaintiffs contend that these magazines do not contain sexually explicit content as it is defined in the regulations, or that they should have been permitted under the exception for materials with educational, historic, artistic, scientific, or literary value. Doc. 157 at 53-56. Nevertheless, the court concludes that the individual defendants are entitled qualified immunity.

Qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quotation omitted). Qualified immunity is "immunity from suit rather than a mere defense to liability [and] it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985). Whether Defendants are entitled to qualified immunity is a legal question. *Wilder v. Turner,* 490 F.3d 810, 813 (10th Cir. 2007).

When the qualified immunity defense is raised, the plaintiff bears the burden of showing, with particularity, facts and law establishing the inference that the defendant violated a clearly established federal constitutional or statutory right. *Walter v. Morton,* 33 F.3d 1240, 1242 (10th Cir. 1994). If the plaintiff fails to satisfy either prong, the defendant is entitled to qualified immunity. *Pearson,* 555 U.S. at 236. If, on the other hand, "the plaintiff has sufficiently alleged the conduct violated clearly established law, then the defendant bears the burden, as a movant for summary judgment, of showing no material issues of fact remain that would defeat the claim of

---

[18] According to the undisputed facts, Defendants removed discrete pages from *Juxtapoz, Decibel,* and *Yoga Journal. See* Doc. 148 at ¶¶ 75, 102, 108, 116. In addition, Defendants removed 4 pages from the September/October 2013 issue of *Air Brush Action. Id.* at ¶ 104. The court observes that in some of their arguments, Plaintiffs seem to suggest that these magazines were censored in their totality. *See* Doc. 157 at 62. However, following the removal of the discrete pages, these publications were otherwise permitted.

qualified immunity." *Morton*, 33 F.3d at 1242. The court has the discretion to consider these prongs in any order it chooses. *Leverington v. City of Colorado Springs*, 643 F.3d 719, 732 (10th Cir. 2011).

As to the first prong, "[i]f no constitutional right would have been violated were the allegations established," the inquiry is at an end. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The second prong — whether the right was clearly established — must be considered "in light of the specific context of the case, not as a broad general proposition." *Id.* An official's conduct "violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing is violating that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). To be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* In addition, "clearly established should not be defined at a high level of generality." *White v. Pauly*, 137 S.Ct. 548, 552 (2017).

In this case, *Maxim*, *Lowrider*, and *Skin & Ink* magazines include photographs of women and men in lingerie, skimpy swimsuits, or other revealing clothing.[19] *See* Docs. 157-52 – 157-136. The censored pages of *Airbrush Action* include similar images. *See* Doc. 157-137 at 1. The censored images from *Juxtapose* and *Decibel* include depictions of exposed breasts and genitalia. Doc. 148-11 at 10; Doc. 148-17 at 13; Doc. 148-18 at 15-16. Finally, the advertisement removed from *Yoga Journal* was a photograph of a woman wearing only a pair of socks and whose arms and legs were strategically placed to avoid exposing her nipples or genitals. Doc. 148-18 at 25.

---

[19] *Skin & Ink* magazine also includes photographs that, but for a strategically placed graphic bar, display the full buttocks of the tattoo models. Some of the featured tattoos are also depictions of women in various states of undress. *See, e.g.*, Doc. 148-18 at 2.

Even if the court assumes that the individual defendants lacked a valid penological justification for censoring any of the foregoing, the court nevertheless concludes that the law regarding what may constitute "sexually explicit materials" is not so clearly established that it would have put Defendants on notice that their conduct was unconstitutional. *Stolle*, 2014 WL 6982470, at \*15 (concluding that jail employees were shielded under the doctrine of qualified immunity because "the state of the relevant law . . . does not indicate that a jail is prohibited from excluding all incoming publications containing revealing images of individuals in sexual poses overtly intended to sexually arouse the viewer"). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) (citing *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987)).

Plaintiffs have not cited any controlling precedent demonstrating that censoring the foregoing images, or similar images, violated the Constitution. Further, "there is at least some non-binding case law holding that arguably similar acts of censorship were constitutional." *Stolle*, 2014 WL 6982470, at \*15. *See also Rapp v. Barboza*, No. 9:13-CV-0599 (NAM/DEP), 2016 WL 4223974, at \*9 n.11 (N.D. Ny. July 19, 2016) (concluding in the alternative that Defendants would be entitled to qualified immunity for the censorship of the *Sports Illustrated Swimsuit Edition*, *Playboy*, *Maxim*, *American Curves*, and *XXL* magazines); *Elfand v. County of Sonoma*, No. C–11–0863 WHA (PR), 2013 WL 1007292, at \*4 (N.D. Cal. Mar. 13, 2013) (upholding the constitutionality of a jail's censorship of issues of *Maxim Magazine* and *GQ Magazine* that displayed pictures of woman and men in "underwear, bikinis, and tight and scant clothing revealing breasts and buttocks" to include an image of a woman in a "see-through bra and 'thong' underwear with her buttocks raised"); *Woods v. Director's Review Committee*, No. H-11-1131, 2012 WL 1098365, at \*1, \*4 (S.D. Tex. Mar. 30, 2012) (concluding that the

defendants were entitled to qualified immunity in a case challenging a Texas prison's censorship of nude photos that had been "blurred in such a way as to disguise or cover up any exposed nudity," noting that there was "no clear statement" in the law that would put an official on notice that it was unlawful to ban such images).

Therefore, the court recommends that the individual defendants' motion for summary judgment be granted to the extent that it invokes the doctrine of qualified immunity to shield them from monetary damages associated with the censorship of the foregoing items. *See Hunter v. Bryant,* 502 U.S. 224, 229 (1991) (noting that "[t]he qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law") (internal punctuation and citation omitted); *Ashcroft,* 563 U.S. at 741 (explaining that "[a] Government official's conduct violates clearly established law" when existing precedent "placed the statutory or constitutional question beyond debate").

B.      Due Process

In the Third Amended Complaint, Plaintiffs alleged that several of the individual defendants violated their right to due process by failing to provide them notice or an opportunity to be heard on censorship decisions. Accepting these allegations a true, the court denied Defendants' motion to dismiss these claims. *See* Doc. 98 at 18-20; Doc. 101 (adopting the Recommendation of United States Magistrate Judge). However, in their Motion for Summary Judgement, Defendant's do not provide any argument regarding these individual claims. Doc. 148. Further, as Plaintiffs correctly observe, Defendants do not appear to move for summary judgment on the basis of qualified immunity as to the due process claims.

In their Reply, Defendants argue for the first time that the law is not clearly established that every offender must have an individualized opportunity to participate in the censorship

decision and, therefore, the individual defendants are entitled to qualified immunity. *See* Doc. 167 at 40. First, unlike their First Amendment analysis, this argument is not well-developed. Second, even if Defendants had provided more than a conclusory analysis on the issue, the argument would nevertheless be improper. "[R]eply briefs *reply* to arguments made in the response brief — they do not provide the moving party a new opportunity to present yet another issue for the court's consideration." *Novosteel SA v. United States,* 284 F.3d 1261, 1274 (Fed. Cir. 2002) (emphasis in the original). Thus, the court declines to address this contention. *See Woods v. Bank of Durango,* No. 11-cv-02676-WYD-CBS, 2012 WL 4378536, at *2 (D. Colo. Sept. 25, 2012) (declining to consider arguments raised for the first time in a sur-reply as a basis for granting summary judgment). To the extent Defendants seek summary judgment on the individual due process claims, the court recommends that such motion be denied.

## CONCLUSION

For the foregoing reasons, the court RECOMMENDS that the Defendants' Motion for Summary Judgment (Doc. 148) be GRANTED IN PART and DENIED IN PART.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego,* 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review." *United States v. Once Parcel of Real Prop.*

*Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar de novo review by the district court of the magistrate judge's proposed findings and recommendations and will result in waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation de novo despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve the issue for *de novo* review by the district court or appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling); *but see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

DATED at Denver, Colorado, this 14th day of June, 2018.

BY THE COURT:

Mark L. Carman
United States Magistrate Judge
District of Colorado